Rick L. KITCHENS, Appellant,

v.

STATE of Alaska, Appellee.

No. A–5165.

Court of Appeals of Alaska.

June 16, 1995.

Hearing Denied Oct. 6, 1995.

444

David D. Reineke, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Richard W. Maki, Asst. Dist. Atty., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

BRYNER, Chief Judge.

Rick L. Kitchens was convicted by a jury of two counts of sexual assault in the first degree, AS 11.41.410(a)(1) (nonconsensual sexual penetration), one count of sexual assault in the second degree, AS 11.41.420(a)(1) (nonconsensual sexual touching), one count of burglary in the first degree, AS 11.46.300(a)(1), and one count of robbery in the second degree, AS 11.41.510(a)(1). Superior Court Judge Karl S. Johnstone sentenced Kitchens to a total term of sixteen years with four years suspended. Kitchens appeals, contending that the trial court erred

in restricting his examination of a defense witness. Kitchens also claims that his composite sentence is excessive. We affirm Kitchens' convictions but remand for reconsideration of the sentence.

## FACTS

Kitchens' convictions stem from an incident of sexual assault reported by N.L. N.L.'s version of events differs markedly from Kitchens'; we turn to N.L.'s version first.

### 1. *N.L.'s Version*

In September of 1992, N.L. lived in an apartment in Anchorage with her fiance, M.W. The couple planned to spend several days in M.W.'s hometown in Texas, where they intended to announce their engagement. M.W. left for Texas on September 14 or 15. N.L. initially made arrangements to depart Anchorage on an early morning flight on September 17. When that flight was cancelled shortly before its scheduled departure, N.L. rebooked herself on a flight leaving early the next morning, September 18.

On the evening of September 17, several hours before she was due to leave, N.L. received a telephone call. The call was from a man N.L. had spoken to on the telephone several times during the past summer. The first time the man had called, N.L. got the impression that he was Zane Vaughn, an assistant wrestling coach at N.L.'s former high school whom N.L. had met several years previously when she was in school and whom she had dated once shortly after graduating; N.L. had a casual conversation with the man. The same man had called N.L. three or four more times during the summer, apparently just to talk. During the subsequent telephone conversations, the man said nothing to indicate that he was not Zane Vaughn, and N.L. continued to assume that he was indeed Vaughn.

When the same man called N.L. on September 17, she again thought that he was Vaughn. After N.L. told him that she was leaving for Texas later that night to join her fiance, the caller offered her a ride to the airport. N.L. accepted the offer and asked the caller to pick her up shortly after midnight. The caller told N.L. to leave her door unlocked.

At about 11:30 p.m., N.L. took a shower. As she walked from the bathroom to her bedroom, she noticed a man seated on the living room couch. N.L. closed her bedroom door and quickly put on a bathrobe. She heard a knock on the bedroom door. When she put her head out to say that she would be out as soon as she finished dressing, N.L. encountered a man wearing white gloves and a knit scarf over his face. The man grabbed N.L., covered her mouth with his hand, and told her not to scream. He demanded money, threatening to snap N.L.'s neck if she did not cooperate. N.L. gave him approximately $200, which he placed into a brown nylon bag that he had brought with him. The man proceeded to sexually assault N.L., forcing her to engage in fellatio and genital intercourse. N.L.'s assailant then fled the apartment, threatening to kill her if she reported the incident.

N.L. did not immediately report the rape to the authorities or to her fiance, M.W. She took a taxi to the airport, caught her scheduled flight, and, upon arrival in Texas, pretended that nothing unusual had happened. Although N.L.'s reluctance to report the rape stemmed to a limited extent from her assailant's death threat, her primary reason for failing to report the incident promptly was her fear of M.W.'s jealous and controlling nature: N.L. was afraid M.W. would not believe that she had been raped and would suspect her of having an affair with another man.

Almost three weeks after the alleged rape, on October 5, 1992—after N.L. and M.W. had returned to Anchorage—an anonymous caller telephoned N.L. and M.W.'s apartment. The caller hung up as soon as M.W. answered the telephone. This prompted N.L. to tell M.W. about the rape. Even though M.W. did not believe N.L., he called the police, who came to the apartment and interviewed her.

N.L. had not gotten a good look at her assailant. Although the man differed somewhat from her memory of Zane Vaughn, N.L. believed she had been raped by Vaughn, and she reported this to the officer

who interviewed her. During the police interview, N.L. received a call from the man she believed to be Vaughn. A portion of the conversation was recorded on N.L.'s answering machine, and the police managed to trace the call to the number from which it originated. At the end of the conversation, N.L. told the caller to call her again two days later, on October 7.

Subsequent investigation established that the call had come from a telephone listed in Kitchens' name. The investigation also disclosed that Zane Vaughn had not been in Anchorage on the date of the alleged rape. After obtaining a warrant, the police recorded the October 7 call to N.L. Following a script that the police had given to her, N.L. attempted to elicit incriminating statements from her caller. Although the caller became suspicious in the course of the call, he ultimately acknowledged: "You know I raped you, you know it was force, but you loved it." Acting pursuant to a second warrant, the police searched Kitchens' apartment; they seized a brown nylon bag that N.L. identified as the bag that her assailant had used to carry her stolen cash, as well as a pair of shorts with an emblem on them that N.L. identified as having been worn by her assailant.

## 2. *Kitchens' Version*

We turn next to Kitchens' version of events. At trial, Kitchens testified in his own defense, admitting that he had engaged in sexual intercourse with N.L. at her apartment, but claiming that the act was consensual.[1] Kitchens' theory of defense was that N.L. had fabricated her charge of rape in order to avoid having M.W. learn of her relationship with Kitchens.

According to Kitchens, he had become acquainted with N.L. during the spring of 1992, when she and M.W. had visited an outdoor show where Kitchens worked at a booth for his employer, an automobile parts supplier. Kitchens claimed that, at the show, N.L. had

asked him about a problem she was having with her car. He could not give her an answer without referring to information in his company's parts computer, so he took N.L.'s number and told her he would call her later.

Kitchens claimed that, when he called N.L. back, he struck up a conversation with her. This led to further calls, and eventually he and N.L. became good friends over the telephone. Kitchens estimated that he had spoken to N.L. hundreds of times over the telephone during the summer of 1992. During these conversations, N.L. would frequently discuss her personal life with Kitchens, would confide in him about problems she was having with M.W., and would seek his advice.

Kitchens testified that when N.L. told him of her impending trip to Texas, he offered her a ride to the airport and arranged to meet her at her apartment. According to Kitchens he had visited the apartment once before, in August. Kitchens claimed that, after arriving on the evening of N.L.'s scheduled departure, he and N.L. sat on the couch, talking about M.W. N.L. told Kitchens that M.W. had been abusive toward her. Kitchens urged her not to go on the trip. He and N.L. then began hugging and kissing; N.L. made the first move. The two ultimately engaged in sexual intercourse in the bedroom. After that, N.L. became upset, saying that they should not have engaged in sexual intercourse and blaming herself for what happened. N.L. insisted that Kitchens leave, declining to ride with him to the airport. Kitchens complied with her request.

## 3. *Trial Court Rulings Restricting M.W.'s Testimony*

In support of his defense, Kitchens called M.W. as a witness at trial. Through M.W.'s testimony, Kitchens apparently sought to emphasize N.L.'s delay in reporting the alleged rape and generally to show that N.L.'s conduct and appearance in the aftermath of the September 17 incident were inconsistent

1. Kitchens also claimed that the incident occurred the night before N.L.'s departure to Texas, not the night of her departure, and he presented an alibi witness in an attempt to establish that the incident could not have occurred on the

night of September 17/18, as reported by N.L. The testimony of the alibi witness was inconclusive, however. In any event, the actual date of the incident proved to be of little significance in light of Kitchens' claim of consent.

with her claim of rape. Kitchens also evidently hoped to emphasize that M.W. himself had been consistently skeptical of N.L.'s version of events.

Kitchens' efforts to obtain favorable testimony from M.W. met only limited success. The trial court restricted Kitchens' questioning of M.W. in three instances.

### a. *N.L.'s Demeanor Upon Arrival in Texas*

The first instance involved the topic of N.L.'s conduct and appearance upon her arrival in Texas the day after the alleged sexual assault. Kitchens' counsel asked M.W.: "Did [N.L.] appear like she had been raped and she was in fear that somebody was out there trying to kill her?" The prosecution objected, contending that the question was speculative and irrelevant. Defense counsel replied that M.W. was "entitled to speak as to how [N.L.] appeared when she got down there[.]" Judge Johnstone sustained the objection.

### b. *N.L.'s Grand Jury Rehearsal*

The second instance of restriction centered on the issue of N.L.'s grand jury testimony. During her cross-examination at trial, N.L. testified about a quarrel with M.W. that was precipitated by her grand jury testimony in April of 1993. N.L. described the following events. Soon after reporting that she had been raped, N.L. enrolled in college in Texas and moved there with M.W. In April of 1993, while she and M.W. were in Texas, N.L. was required to appear by telephone before an Anchorage grand jury. Shortly before the grand jury hearing, N.L. spoke on the telephone with an assistant district attorney from Anchorage in order to "rehearse" her proposed grand jury testimony. M.W. was suspicious of N.L.'s account and wanted to hear what had actually happened. He tried to convince N.L. to allow him to listen to her grand jury testimony. N.L. resisted, and she and M.W. quarrelled. M.W. became physically abusive toward N.L.; this quarrel, in turn, ultimately led to the breakup of N.L. and M.W.'s relationship.

As part of the defense case at trial, Kitchens' counsel attempted to question M.W. about the "big fight in April" with N.L. The prosecution objected on the ground of relevance. Kitchens' counsel responded:

Well, she indicated on—several times on cross-examination that he hadn't been abusive [before] and she did say, however, that he was abusive after the incident.... I want to tie it in with the grand jury portion of it that he had suspicions about, you know, the—her veracity when she was testifying at the grand jury and that's why he wanted to sit in.

Judge Johnstone allowed defense counsel to make a formal offer of proof by examining M.W. out of the presence of the jury. In relevant part, the questioning went as follows:

Q Okay. Now, the rehearsal, who was that with?

A I'm thinking Suzanne. I don't know. It was one of the assistant DAs.

Q And that was a rehearsal over the phone as to how

. . . . .

A It was a rehearsal over the phone and I called her

. . . . .

Q Just—please, we're just trying to make a quick record. The rehearsal was with respect to what?

A Grand jury for the next day.

Q Okay. In other words, she was rehearsing her testimony over the phone with the district attorney for grand jury testimony for the following day.

A Correct.

Q Okay. Did you want to listen in to that—not to the rehearsal, but to her grand jury testimony?

A I—I'd made the statement that yeah, I was going to, that I would do that, but . . .

Q Why's that?

A Because I wanted to hear whatever was going to be said. I wanted to know what the truth was.

Q Okay. Is that because you didn't believe her?

A Well, yeah, I had doubts, yes.

Q Okay.

Judge Johnstone precluded the defense from pursuing this line of inquiry. Upon concluding his offer of proof, however, Kitchens' attorney further asked: "[C]ould I at least, Judge, get from this witness that there was the rehearsal, a telephone conversation?" The prosecution objected on the ground that defense counsel was inappropriately attempting to elicit M.W.'s opinion as to N.L.'s behavior. Judge Johnstone sustained the objection and denied defense counsel's request.

#### c. N.L.'s Return to Alaska

The third instance in which the trial court restricted Kitchens' examination of M.W. related to N.L.'s decision to move back to Alaska during the spring of 1993 in order to take a job. M.W. had advised N.L. not to return to Alaska. Kitchens' attorney sought to question M.W. about N.L.'s willingness to return to Alaska despite M.W.'s advice and despite her knowledge that Kitchens had been released on bail after being charged with sexual assault. Kitchens' attorney argued: "Well, I think it goes to her state of mind that he's concerned, [']why are you taking this job when you know that this guy's out there on the streets[,'] because he's worried about protecting her and she seems totally carefree and unconcerned." Judge Johnstone excluded the proposed testimony: "Your witness giving an opinion she didn't seemed concerned about working on the slope ... there's nothing in the rules to provide for that."

### DISCUSSION

On appeal, Kitchens challenges the trial court's rulings as erroneous in each of the foregoing instances involving restriction of M.W.'s testimony. As to each instance, Kitchens asserts that the proposed testimony was relevant to impeach N.L.'s credibility.

Pointing out that evidence relating to the demeanor of the complaining witness in a rape case has frequently been held admissible to bolster the complainant's credibility,[2] Kitchens argues that the same rule should be applied when demeanor evidence is offered to discredit the complainant.[3] Kitchens insists that exclusion of relevant defense evidence amounts to constitutional error. *See Michigan v. Lucas*, 500 U.S. 145, 151, 111 S.Ct. 1743, 1747, 114 L.Ed.2d 205 (1991); *Rock v. Arkansas*, 483 U.S. 44, 55–56, 107 S.Ct. 2704, 2711–12, 97 L.Ed.2d 37 (1987).

In response, the state maintains that Kitchens had no right to have M.W. testify that he did not believe N.L.'s claim of rape, since that testimony would amount to M.W.'s lay opinion as to the truthfulness of N.L.'s testimony. The state analogizes Kitchens' case to child sexual abuse cases in which this court has disapproved of expert testimony offered to establish the truthfulness of the complainant's report of abuse. *See, e.g., Colgan v. State*, 711 P.2d 533 (Alaska App.1985). Alternatively, the state argues that the trial court allowed Kitchens to introduce abundant evidence of N.L.'s post-assault demeanor.

Both parties acknowledge that trial court rulings on the admissibility of evidence are ordinarily subject to review only for abuse of discretion. *Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980); *Garner v. State*, 711 P.2d 1191, 1195 (Alaska App.1986). As Kitchens correctly points out, however, this court has previously emphasized the importance of the defendant's right to present favorable evidence and has expressly cautioned that "[t]he fundamental nature of the right counsels strongly against its grudging and parsimonious application." *Shepard v. State*, 847 P.2d 75, 83 (Alaska App.1993). With these principles in mind, we examine each of the rulings disputed in this case.

2. As examples of such cases, Kitchens cites *State v. Alexander*, 303 S.C. 377, 401 S.E.2d 146, 148 (1991), *State v. Shaw*, 149 Vt. 275, 542 A.2d 1106, 1107 (1987), and *Padilla v. People*, 156 Colo. 186, 397 P.2d 741, 743 (1964).

3. Kitchens cites *Larson v. State*, 102 Nev. 448, 725 P.2d 1214 (1986) (describing as arguably relevant to a consent defense a photograph of the complaining witness smiling shortly after the alleged assault). Kitchens also cites *State v. McCarthy*, 446 A.2d 1034 (R.I.1982) (finding error in exclusion of evidence that the complainant filed and withdrew charges against another man shortly after the alleged sexual assault), but *McCarthy* did not involve demeanor evidence.

## 1. N.L.'s Demeanor Upon Arrival in Texas

 The propriety of the first ruling restricting M.W.'s testimony, which centered on N.L.'s demeanor upon her arrival in Texas immediately after the alleged assault, is the easiest to deal with. N.L.'s demeanor on the day after the alleged rape was certainly a legitimate area of inquiry for the defense. Contrary to Kitchens' argument on appeal, however, Judge Johnstone did not preclude Kitchens from questioning M.W. about N.L.'s appearance and conduct in the immediate aftermath of the assault. Rather, the judge simply sustained an objection to a single question during Kitchens' redirect examination of M.W. that was argumentative and called for speculation on M.W.'s part: "Did she appear like she had been raped and she was in fear that somebody was out there trying to kill her?"

By this point, M.W. had already testified on direct examination that N.L. had given him no indication upon arriving in Texas "that she might have been raped or traumatized or put in fear[.]" He had also said that N.L. "seemed like the same [N.L.] I'd known all along." Furthermore, M.W. had reiterated on cross-examination that N.L. had given him no indication of "anything being different or extraordinary" when she came to Texas after the alleged rape. Finally, after Judge Johnstone sustained the objection to the disputed question, Kitchens successfully pursued the same point in a less argumentative way, asking M.W. if N.L. had given him "any inkling at all" that she had been raped; M.W. replied that she had not.[4] Given these circumstances, we find no abuse of discretion.

## 2. N.L.'s Grand Jury Rehearsal

The second disputed ruling involves Kitchens' attempt to question M.W. about N.L.'s grand jury testimony. Kitchens offered two reasons for pursuing this line of inquiry. His primary objective was to establish that M.W. had wanted to hear N.L. testify because he did not believe her story; his secondary objective—offered as an apparent afterthought when the trial court rejected Kitchens' primary theory—was to apprise the jury that N.L. had rehearsed her story before giving her grand jury testimony.

### a. M.W.'s Opinion of N.L.'s Credibility

 With respect to Kitchens' primary objective, the trial court correctly recognized that Kitchens had no right to prove M.W.'s disbelief of N.L.'s charges against Kitchens. Kitchens was not entitled to present M.W.'s lay opinion as to the credibility of N.L.'s story unless he first established that the opinion was rationally based on M.W.'s own observations and that the opinion would have been helpful to the determination of a fact in issue. See Alaska Rule of Evidence 701.[5] In the present case, M.W. repeatedly acknowledged that his skepticism toward N.L.'s version of events was not rationally based on his observations of N.L.'s behavior, but that it arose instead from his own jealous and possessive nature.

Moreover, we fail to see how M.W.'s opinion of the credibility of N.L.'s story could have materially assisted the jury in deciding any disputed fact. The court did not preclude Kitchens from questioning M.W. about specific observations indicating a lack of candor on N.L.'s part. Hence, the jury was fully capable of forming its own opinion as to N.L.'s credibility and stood in no apparent need of assistance from M.W. M.W.'s personal opinion as to the truthfulness of the complaint had no bearing on any issue apart from the issue of N.L.'s general credibility.

To the extent M.W.'s opinion might have been relevant for general impeachment of

---

4. Moreover, the point was hardly disputed. In her own testimony, N.L. had readily acknowledged that she told no one about the incident until after she and M.W. returned from Texas. Specifically, N.L. indicated on cross-examination that, when she arrived in Texas, she tried to act as if nothing had happened. She also stated that she gave M.W. no inkling that something had happened to her.

5. A.R.E. 701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.L.'s credibility, its admissibility was governed by Alaska Rule of Evidence 608(a) and (b).[6] Under this rule, Kitchens could properly ask M.W. for his opinion of N.L.'s general credibility, but Kitchens was not entitled to elicit M.W.'s opinion as to the credibility of any specific statement by N.L.

Finally, by the time the trial court precluded Kitchens from delving farther into M.W.'s opinion of N.L.'s version of events, the jury had already been given a clear picture of M.W.'s personal opinion. M.W. had testified at the outset of his direct examination that he "always doubted [N.L.] in a lot of ways." And N.L. had specifically testified, on cross-examination by defense counsel, that M.W. had tried to listen to her grand jury testimony because he did not believe her and because he wanted to make sure that she was telling the truth.

### b. The Fact of N.L.'s Rehearsal

The trial court's rejection of Kitchens' offer to question M.W. about N.L.'s "rehearsal" of her grand jury testimony—the second-ary purpose of Kitchens' proposed inquiry into the events of April 1993—presents a somewhat closer issue. Contrary to the state's assertion below (which Judge Johnstone evidently accepted), it does not appear from the record that Kitchens sought to question M.W. as to any opinion M.W. might have formed concerning the rehearsal. Rather, it seems that Kitchens sought merely to establish, through M.W., that a grand jury rehearsal had occurred: that M.W. had witnessed N.L. discussing her proposed grand jury testimony with a prosecutor the day before the grand jury hearing.

■ To the extent that this evidence might have shown that N.L. concocted her testimony, it was relevant and arguably admissible. But it was also wholly cumulative. In his cross-examination of N.L., Kitchens thoroughly explored N.L.'s rehearsal of her grand jury testimony. N.L. expressly acknowledged that the rehearsal had occurred, and she described the event.[7] Given N.L.'s acknowledgement of the fact that she had rehearsed her grand jury testimony, we find

6. Alaska Rule of Evidence 608(a) and (b) provides:

(a) **Opinion and Reputation Evidence of Character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness; and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) **Specific Instances of Conduct.** If a witness testifies concerning the character for truthfulness or untruthfulness of a previous witness, the specific instances of conduct probative of the truthfulness or untruthfulness of the previous witness, may be inquired into on cross-examination. Evidence of other specific instances of the conduct of a witness offered for the purpose of attacking or supporting that witness' credibility is inadmissible unless such evidence is explicitly made admissible by these rules, by other rules promulgated by the Alaska Supreme Court or by enactment of the Alaska Legislature.

7. The relevant portion of N.L.'s testimony concerning the rehearsal is as follows:

Q The day before you testified at the grand jury, you had a call from the district attorney, right?
A Yes.
Q You spoke with her and I believe her name was Suzanne Lombardi or was it Diane O'Gorman?
A Diane O'Gorman.
Q Okay. And you had sort of a rehearsal.
A Yes.
Q A rehearsal of what she was going to ask you? That's a question.
A Yes.
Q And a rehearsal as to what you would answer.
A As to what was the truth.
Q As to what you would answer.
A Yes.
Q Okay. And at that point, you had set up for the following date a telephonic conference for you to participate at the grand jury.
A Yes.
Q And that had been a prob—there was a dispute between you and [M.W.] as to where the call was being set up.
A That's correct.
Q Because apparently you had set it up at some friends of his parents house.
A Correct.
Q And he did not want that.
A That's right.
Q In fact, he wanted to sit in and listen to your testimony at the grand jury.
A That's correct.
Q Because he did not believe you.
A At that point, I don't know.

no abuse of discretion in the trial court's refusal to allow further inquiry of M.W. on the same point.

### 3. *N.L.'s Return to Alaska*

#### a. *Admissibility*

The trial court's third disputed ruling dealt with Kitchens' request to question M.W. about N.L.'s decision to return to Alaska after Kitchens' indictment. The court's rejection of Kitchens' request is troubling. Contrary to the view expressed by the court below and to the state's argument on appeal, Kitchens' offer of proof did not involve an attempt to obtain speculative or otherwise impermissible opinion evidence from M.W.

■ Kitchens' desire to prove that N.L. displayed no fear and seemed "totally carefree and unconcerned" when she decided to return to Alaska in the spring of 1993 would not have required M.W. to express any opinion beyond his opinion of N.L.'s state of mind. This opinion, in turn, would have been based on M.W.'s personal observation of N.L.'s demeanor and on statements by N.L. revealing her own state of mind. Evaluation of personal demeanor is an inherent part of ordinary social interaction and, in most situations, entails little more than commonsense judgment. Hence, if demeanor is relevant, there is ordinarily nothing impermissible in asking a witness to describe the demeanor of a person with whom the witness has spoken. The trial court erred in concluding that the proposed inquiry called for speculative opinion evidence. Assuming N.L.'s state of mind was relevant, M.W.'s proposed testimony was a proper vehicle for its proof.

The state does not contend that N.L.'s lack of fear was irrelevant; nor does it appear that such an argument could be sustained. N.L. claimed that her assailant had threatened to kill her. Kitchens offered to show that, against M.W.'s wishes and despite her knowledge that Kitchens had been released on bail after being charged with her assault, N.L. readily accepted a job that required her to return to Anchorage. According to the proposed testimony, in deciding to take the job, N.L. had shown no signs of concern or fear.

■ Evidence of N.L.'s carefree attitude was at least marginally relevant to Kitchens' consent defense and tended to undermine N.L.'s credibility, since N.L.'s apparent lack of fear might indicate that in actuality she had no reason to fear Kitchens—that Kitchens had never threatened her. Because we find nothing in the record to support the conclusion that this evidence had any potential for prejudice that might have outweighed its probative value, we conclude that the trial court erred in excluding it.

#### b. *Harmless Error*

■ We must separately consider whether the error was sufficiently prejudicial to require reversal. Given the significance and constitutional dimension of the accused's right to present favorable evidence, we assume that the constitutional standard of review applies in Kitchens' case, and we inquire whether the error was harmless beyond a reasonable doubt. *Love v. State,* 457 P.2d 622 (Alaska 1969); *but see Shepard v. State,* 847 P.2d at 84 (applying nonconstitutional standard in an analogous situation in holding that error required reversal).

Kitchens correctly argues that N.L.'s credibility was a crucial issue at trial. Nevertheless, the excluded evidence—while unquestionably relevant to some degree—was not particularly forceful: it dealt with N.L.'s state of mind at a time well-removed from the date of the alleged assault, and its probative value depended on a relatively attenuated series of inferences. Kitchens had at his disposal many other, more compelling grounds for impeachment, including N.L.'s failure to report the incident for more than two weeks, her apparent lack of fear or distress in the immediate aftermath of the assault, her numerous inconsistent statements, and her initial misidentification of Zane Vaughn as her assailant. Kitchens' trial counsel ably availed himself of these alternative grounds for impeachment.

In the final analysis, it seems clear that Kitchens' lack of success in attempting to challenge N.L.'s credibility stemmed not from any dearth of material to work with, but rather from the strength of the prosecution's

case. Even apart from N.L.'s testimony, the evidence against Kitchens was extremely strong: it included the tape-recorded telephone conversation in which he admitted that he had forced N.L. to have sex with him. This admission was followed by a police interview in which Kitchens, unaware of the recording, adamantly denied any contact with N.L. at all. Only after learning of the recording did Kitchens claim consent.

■ By far the most significant factor bearing on the issue of harmless error in Kitchens' case, however, is that Kitchens was allowed to cross-examine N.L. on virtually the same issue that the court barred him from covering with M.W. And N.L.'s responses to Kitchens' questions did not differ materially from the proposed testimony that was improperly excluded. N.L. candidly acknowledged that she decided to return to Alaska against M.W.'s advice and with full knowledge that Kitchens had been released on bail.[8] Given N.L.'s testimony on cross-examination, M.W.'s testimony would have added nothing of material value to the evidence already before the jury. In short, our review of the record convinces us that the error was harmless beyond a reasonable doubt.

## SENTENCING

Kitchens separately contends that his sentence is excessive. A first felony offender,

Kitchens was convicted of five felonies in the present case: two counts of first-degree sexual assault, one count of second-degree sexual assault, one count of first-degree burglary, and one count of second-degree robbery. The two counts of first-degree sexual assault are unclassified felonies carrying a maximum term of thirty years' imprisonment. Kitchens was subject to a presumptive term of eight years for each count; the superior court found no aggravating or mitigating factors applicable to these offenses. The remaining offenses are class B felonies, for which the maximum term is ten years; no presumptive term applied to these offenses. For the two counts of first-degree sexual assault, Judge Johnstone sentenced Kitchens to consecutive terms of eight years and eight years with four years suspended. The judge imposed lesser, concurrent sentences for the remaining offenses. Kitchens' composite sentence is thus sixteen years with four years suspended.

■ This composite term falls well within the sentencing range of ten to fifteen years that has been established as a benchmark for first felony offenders convicted in aggravated cases of first-degree sexual assault or abuse. See, e.g., DeGross v. State, 768 P.2d 134, 139 (Alaska App.1989). Given that Kitchens' case involved two separate acts of first-degree sexual assault and three subsidiary class B felonies, his case readily qualifies as an aggravated one.[9]

8. The relevant portion of N.L.'s cross-examination is as follows:

Q Okay. [M.W.], however, was scared for you to be back up in Alaska, right?
A Yes.
Q And—but sometime after the grand jury, you decided to come up anyway.
A Yes.
Q And that was against his wishes.
A Yes.
Q And you were no longer scared.
A That's not true.
Q Well, you no longer had [M.W.] to protect you, right?
A I was no longer with [M.W.].
Q That's right. And he had cautioned you about taking a job up at the slope because you would be in Anchorage two weeks— you would be up at the slope two weeks, two weeks in Anchorage, right?
A Two weeks in Alaska.
Q Two weeks in Alaska and [M.W.] was scared that the person who had been in-

dicted who was not [sic] on the streets might come after you, right?
A Yes.
Q But you were not scared and you took the job anyway.
A I can't say I wasn't scared, but, yes, I did take the job anyways.

9. Prior to sentencing, the state proposed, as an aggravating factor, that Kitchens' conduct was among the most serious included in the definition of first-degree sexual assault. See AS 12.55.155(c)(10). Judge Johnstone rejected this proposed factor, finding that Kitchens' conduct was no more serious than conduct typically involved in first-degree sexual assault cases. We do not construe Judge Johnstone's rejection of the state's proposed aggravating factor to be incompatible with the conclusion that Kitchens' case is an aggravated one for purposes of the applicable sentencing benchmark. Aggravating factors such as that proposed by the state and rejected by Judge Johnstone apply to individual

■ We nevertheless find it necessary to remand for reconsideration of Kitchens' sentence. In addressing his decision to impose consecutive sentences in Kitchens' case, Judge Johnstone commented: "Legislation recognizes that when dealing with multiple sexual assault cases, consecutive sentences must be imposed." The sentencing court's belief that consecutive sentences were mandatory is incorrect; in the circumstances of Kitchens' case, Judge Johnstone was authorized to impose Kitchens' sentences consecutively or concurrently.[10] Given the court's apparent belief that consecutive sentences

were mandatory, we must remand Kitchens' case for resentencing under the correct legal standard.[11]

We AFFIRM Kitchens' convictions and REMAND his case for resentencing as directed.

which consecutive sentencing is mandatory in the event of multiple convictions for assaultive crimes in which the victim or victims are minors. N.L. was not a minor.

offenses on a count-by-count basis. In contrast, the benchmark sentencing range discussed in *DeGross* applies to the totality of an offender's conduct in a given case. We find nothing inconsistent in concluding, on the one hand, that Kitchens' individual acts of first-degree sexual assault were not among the most serious included in the definition of the offense, while finding, on the other, that the totality of his conduct in this case is sufficiently serious to qualify the case, on the whole, as an aggravated case of first-degree sexual assault.

10. *See* AS 12.55.025(e) & (g); *State v. Andrews,* 707 P.2d 900, 908–09 (Alaska App.1985), *aff'd* 723 P.2d 85 (Alaska 1986). Perhaps the sentencing court had in mind AS 12.55.025(h), under

11. We recognize that, in imposing sentence, Judge Johnstone emphasized that the individual sentences he imposed were of secondary importance and that his overriding intent was to impose a composite term of sixteen years with four years suspended. Nevertheless, it is unclear whether or to what extent Judge Johnstone's choice of an appropriate composite term was colored by his belief that consecutive sentences were mandatory for the first-degree sexual assault convictions.