Samuel H. SNYDER, Appellant,

v.

STATE of Alaska, Appellee.

No. A-8720.

Court of Appeals of Alaska.

June 3, 2005.

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

COATS, Chief Judge.

Samuel H. Snyder was charged with sexual assault in the second degree for engaging in sexual intercourse with M.K., who was either incapacitated or did not know that the sexual act was being committed. Snyder argues that Superior Court Judge Dale O. Curda erred in excluding two witnesses who would have testified that, just two weeks after the assault, M.K. went to the auto parts store where Snyder worked, and Snyder assisted her. According to the two witnesses, during this encounter, M.K. spoke amicably with Snyder and did not appear to be frightened of or angry with him. We conclude that Judge Curda erred in excluding this testimony and we reverse Snyder's conviction.

*Factual background*

In the early morning hours of October 13, 2002, M.K. went drinking in Bethel with two of her friends, Tamara Evon and Marilyn Wassillie. The three women drove around town. Evon was driving, and M.K. and Wassillie drank. M.K.'s friends dropped her off at the BNC apartments where M.K. had more drinks with a man and woman she knew. M.K. then took a cab home.

From her home, M.K. then walked to her cousin Cindy Paul's house. Paul did not answer her door, so M.K. continued on to the home of Samuel H. Snyder. M.K., Snyder, and her late brother, James, had all grown up together. M.K. considered Snyder to be a friend. Since her brother's death, M.K. had become depressed, and she wanted to talk to Snyder about him. Snyder and M.K. sat on his porch drinking and talking about M.K.'s brother.

At some point, M.K. claims she blacked out. M.K awoke hours later and found that she was inside Snyder's living room with her pants and underwear pushed down to her knees. She had no memory of how she got from the porch to the living room. M.K. could feel that someone had had sex with her. M.K. was still very intoxicated. She got dressed and went next door to the house of her cousin Marie Lekander. Lekander was awakened by M.K.'s knocking and answered the door. She found M.K. disheveled, crying, and intoxicated. M.K. told Lekander that she had been raped. Lekander called the police and Bethel Police Officer Terry Stonecipher responded.

Officer Stonecipher found M.K. curled up in a corner crying. It was apparent to Officer Stonecipher that M.K. was still intoxicated. Although he found it difficult to get information from M.K., Officer Stonecipher determined that a sexual assault exam was necessary.

At the hospital, M.K. was examined by Kayle York, a nurse trained in treating sexual assault victims. York also found M.K. to be "very intoxicated." York discovered that M.K.'s blood alcohol level was still .223 percent.

Officer Stonecipher obtained a warrant to search Snyder's house. He executed the warrant and interviewed Snyder. Initially, Snyder denied having sex with M.K. He later admitted having sex with her, but explained that he had thought she wanted to have sex. He claimed she herself had pulled down her pants and underwear while sitting on his couch.

Snyder also told Officer Stonecipher that M.K. had been visibly intoxicated when she arrived at his house around 4:30 a.m. Snyder turned over to Officer Stonecipher a used condom.

Snyder was indicted for one count of sexual assault in the second degree, on the theory that he engaged in sexual penetration with

M.K. while she was either incapacitated or unaware that a sexual act was being committed.[1]

Snyder defended on the ground that either M.K. had consented to the sexual penetration or he at least had reasonably believed that she was consenting. In support of his case, Snyder sought to call two witnesses, Richard Yager and Barbara Engebreth. Yager and Engebreth testified in an offer of proof out of the presence of the jury. They testified that, just two weeks after the assault, M.K. went with Engebreth to an auto parts store where Snyder worked. Yager was present because he was the manager of the auto parts store. Snyder assisted M.K. at the store. During this encounter, M.K. and Snyder appeared to be friendly with each other and M.K. did not appear to be afraid of or angry with Snyder. Ingebreth testified that she did not recall M.K. making any negative comments about Snyder either before or after she spoke to him. Snyder contended that M.K.'s behavior at the auto parts store was inconsistent with her assertion that Snyder had engaged in sexual intercourse with her while she was either incapacitated or unaware that he was committing the sexual act.

After hearing this offer of proof, Judge Curda concluded that the proposed evidence was not admissible. Judge Curda applied Evidence Rule 403, under which a trial judge may exclude testimony if the judge concludes that the probative value of the testimony is outweighed by the danger of unfair prejudice. Judge Curda found that the proposed evidence had very low probative value. Judge Curda reasoned that M.K. had no reason to be afraid of Snyder at the auto parts store. The store was full of people and M.K. had a friend with her. Judge Curda also described Bethel as a small place where people were generally friendly to each other. He concluded that there was nothing unusual about M.K.'s being friendly towards Snyder,

and that there was a risk of confusing the jury by bringing an additional issue into the trial.

This court addressed a similar issue in *Kitchens v. State.*[2] In *Kitchens*, the defendant was convicted of breaking into the victim's Anchorage apartment and sexually assaulting her.[3] The day after the assault, the victim moved out of state.[4] The victim did not report the assault right away, and contended that this was partly because Kitchens had threatened to kill her if she did.[5]

Kitchens attempted to present testimony (from the victim's ex-boyfriend) that the victim decided to return to Anchorage despite the fact that, after Kitchens had been indicted for the sexual assault, he was released on bail. The witness would have testified that it was his personal observation that the victim was "totally carefree and unconcerned" with the fact that Kitchen would be out of custody in the city to which she was returning.[6] The trial court excluded this testimony on the ground that it was impermissibly speculative opinion evidence.[7]

This court disagreed with the trial court's ruling that the ex-boyfriend's observation of the victim's demeanor was impermissible opinion evidence. We stated:

> Evaluation of personal demeanor is an inherent part of ordinary social interaction and, in most situations, entails little more than commonsense judgment. Hence, if demeanor is relevant, there is ordinarily nothing impermissible in asking a witness to describe the demeanor of a person with whom the witness has spoken. The trial court erred in concluding that the proposed inquiry called for speculative opinion evidence.[8]

We then went on to conclude that evidence of the victim's carefree attitude was relevant to undermine the credibility of the victim's claim that she had not reported the rape in

1. AS 11.41.420(a)(3)(B), (C).

2. 898 P.2d 443, 451–52 (Alaska App.1995).

3. *Id.* at 444–45.

4. *Id.* at 446.

5. *Id.* at 445.

6. *Id.* at 451.

7. *Id.* at 448.

8. *Id.* at 451.

part because Kitchens had threatened to kill her:

> Evidence of [the victim's] carefree attitude was at least marginally relevant to Kitchens' consent defense and tended to undermine [the victim's] credibility, since [the victim's] apparent lack of fear might indicate that in actuality she had no reason to fear Kitchens—that Kitchens had never threatened her. Because we find nothing in the record to support the conclusion that this evidence had any potential for prejudice that might have outweighed its probative value, we conclude that the trial court erred in excluding it.[9]

 The same reasoning we applied in *Kitchens* leads us to conclude that Judge Curda erred in excluding the testimony that described M.K.'s apparently friendly interaction with Snyder at the auto parts store. The State attempts to distinguish *Kitchens* on the ground that Snyder was not charged with a forceful rape of M.K. He was charged with having sexual intercourse with M.K. while she was either incapacitated or unaware that the sexual act was being committed. But, in presenting its case, the State relied on evidence that M.K. was extremely upset after she concluded that Snyder had sexual intercourse with her while she was incapacitated. The State's argument also ignores Snyder's theory of the case, that M.K. initially consented to the sexual intercourse, or at least acted as if she did. Snyder theorized that M.K. might later have changed her mind or, in her intoxicated state, could not remember what happened. Snyder wanted to argue that M.K.'s interaction with him at the auto parts store was inconsistent with her testimony that Snyder had sexual intercourse with her while she was incapacitated or unaware of the sexual act and that she was extremely angry with Snyder for taking advantage of her.

Judge Curda's evaluation of M.K.'s interaction with Snyder at the auto parts store is certainly a plausible conclusion from the evidence. M.K. might have felt safe in that situation and might have concluded that being friendly to Snyder was the most sensible way to handle an awkward situation. But the opposite conclusion is also possible. M.K.'s interaction with Snyder at the auto parts store might very well be inconsistent with her claim that Snyder had engaged in sexual intercourse with her while she was incapacitated or unaware. The point is that Snyder was entitled to a jury trial. It was up to the jury to determine the weight to give the evidence. We do not believe that having the two witnesses testify before the jury would have taken an inordinate amount of time or would have confused the jurors. The testimony was relevant for the jury to evaluate M.K.'s credibility. We conclude that Judge Curda erred in failing to allow Snyder to present this evidence.

Relying on *Kitchens*, the State argues that, if Judge Curda erred, the error was harmless. In *Kitchens* we found the error in failing to admit the evidence of the victim's post-incident behavior was harmless error. But in *Kitchens*, the State had a very strong case against the defendant. The State had a tape-recorded telephone call in which Kitchens admitted that he had raped the victim. Furthermore, Kitchens was able to cross-examine the victim about her return to Alaska. And the victim essentially conceded the matters which Kitchens wanted to establish with independent testimony.[10] We therefore concluded that the failure to admit the independent evidence was harmless error. But Snyder's case is different. M.K.'s credibility was critical to determining Snyder's guilt or innocence. Snyder was unable to get the evidence of his contact with M.K. at the auto parts store into evidence. And, as we have pointed out, the jury might have found this evidence important to evaluate M.K.'s credibility. We accordingly conclude that the error was not harmless.

## Conclusion

The trial court erred in refusing to allow Snyder to introduce evidence of his interaction with M.K. at the auto parts store. And we conclude that this evidence was important

---

**9.** *Id.*

**10.** *Id.* at 452.

for the jury to evaluate M.K.'s credibility. We accordingly reverse Snyder's conviction.

The conviction is REVERSED.